23-1374 and 23-1880, Western Missouri, Brooke Henderson et al. v. Springfield R-12 School District et al. Mr. Busick Good morning, Your Honors. May I please the Court? Counsel. Brooke Henderson and Jennifer Lumley are both educators at Springfield Public Schools in Missouri. They believe in equality and they believe in colorblindness, and they hold faith-based views that inform their belief on race, politics, and the nature of human identity. But during the fevered political climate of 2020, SPS adopted conflicting views to theirs. And while the government is allowed to have a viewpoint, what it may never do is use its role as public employer to compel political advocacy out of its employees. And so in the fall of 2020, when SPS decided to hold mandatory workshops in so-called anti-racism, it crossed an impermissible line when it pressured its employees to adopt beliefs in line with SPS's and become advocates for the district's ideology. Do you know the critical word I don't find anywhere in your briefs? Forum. What is the forum here and what kind is it? Right, Your Honor. This is a forum where they're entitled to full First Amendment. What is the forum? Your Honor, this is, I believe, the middle-tier forum which the Supreme Court has used. What is it? Are we just talking the employee training sessions? We are talking the employee training session, Your Honor, but we are also— Okay, that's the forum. It's not speech made to the public. Yes, Your Honor, correct. We are talking about— And what kind of forum is that? That's what I thought, but nobody says that, including the district court. That's true. Nobody has raised the forum analysis here, and I respectfully say— We can't do this case without a forum analysis. The Supreme Court says start there. Well, Your Honor, the Supreme Court has typically considered forum analysis in the instances of school boards, but in any event, what we have here is not just a demand that these people engage in speech at the workshop trainings themselves, but we have an out-and-out requirement that they go out and— Tell me what kind. Is it a public forum? No, Your Honor. Certainly not. No, it's not a public forum. Is it a private forum? Arguably. We think it's the middle-tier forum, and the Supreme Court has used— You mean limited public forum. Well, that is, I believe, the lower-tier forum, or non-public forum. The Supreme Court has used mixed language when it comes to its forum analysis, and I just want to— But it's been very clear on a limited public forum analysis. Right. What's this middle tier? I don't remember that. There's three tiers as outlined by the Supreme Court in the Manski decision. That's the Supreme Court's most recent— What? The Manski decision. That's the Supreme Court's most recent forum analysis. But in any event, Your Honor, the forum analysis here really doesn't determine the outcome of it, not just because this isn't just limited to the workplace training, but the workplace— Well, if you aren't going to tell me what's the forum and what's the test, then that's fine. I'll be quiet. Your Honor, I'm trying to explain that there is no actual balancing test here because it is a compelled speech instance. And in the Supreme Court's— Give me a compelled speech where nothing was compelled in public. Your Honor, a compelled speech case is the 303 Creative case. That— What? The 303 Creative case from this last summer. Now, admittedly, that wasn't a forum case, but our suggestion here is that the compelled speech steps outside that forum. I mean, I'm not aware of any case where the Supreme Court has used a forum analysis involving compelled speech. No, because there's always—it's always something public has always been compelled. Well, Your Honor, in the Janus decision, it considered compelled speech in the context of public employment. And the Supreme Court there specifically said that it couldn't imagine a scenario in which the government could ever satisfy First Amendment scrutiny for employees that aren't offered the option of remaining silent. And that's— When the speech is not related to official duties. That's right. That's correct, Your Honor. That's the one qualification that the Supreme Court added to the instruction. Wouldn't training typically be related to official duties, whether it's good or bad training? Not—well, it could be. It should be. But the mere fact that they've called it training does not mean it is, in fact, part of their job duties. Indeed, I think there's a reason why my friend on the other side has never raised job duties as part of her argument. And that's because the Supreme Court said in the Kennedy decision that the government's ability to control the speech of educators in the workplace is not limitless. But how—this is training about equity and equality for students in a school system. And I'm not sure how that isn't part and parcel of what they're doing, what their mission is at a school. Well, they certainly never explained in their brief how that could be so. They've never even responded to our arguments. So is it your position that that kind of training for ensuring that every student gets an equal education and an equal opportunity is not appropriate for a training session? It certainly would be appropriate to have training of that sort, Your Honor. What a school district may never do, however, is compel its employees and pressure them to engage in political advocacy extending into their personal lives. Well, let's talk about the political advocacy. What was the political advocacy? Affirmation and expressing of support of anti-racism, which the school district itself defined in slide 31 of the training itself as meaning, quote, advocating for change in political, economic, and social life. But where is it that the school was asking them to agree to that and actually express? Because as I saw it, they said, express your views. Your clients did express their views. They didn't like the response of the trainers or maybe coworkers. But tell me how they were forced to adopt that statement or say that statement. Well, sure, Your Honor. First, most glaringly, the training concluded with an anti-racist solo right where they were expected to write out what steps they would take to becoming anti-racist. Again, a term that the school district had previously defined as advocating for change in political, economic, and social life. And since that's not something that any government employee can do on the taxpayer dime, that can only be construed as a demand to go out and engage in the district's preferred politics. But let me pause right there and say, under the correct standard for compelled speech, the test is whether or not the government is trying to bring unlawful pressure to bear to get people to speak when they would prefer to remain silent. The test is not whether or not it succeeds in altering speech or belief. There's four points. Let me briefly sketch them out, and I'll try to get to them more with some more substance. But the first is there's a right to refrain from speaking altogether, not just to mount the government's view. And your clients decided not to speak at times? That's true. And secondly, the government need not… Could you please distinguish between what they did in the training sessions and what you're arguing they were compelled to do elsewhere? Well, what they did at the training session… and I don't care if it's an employee or what. I want you to argue this position. Oh, but, Professor, I can't do that. I don't agree with that. Well, just do me a favor and argue it. I want to make sure you understand what you don't agree with. That's a permissible pedagogical tool, Your Honor, but that's quite different than what we have here. Why? Well, first and foremost, there's a command that they go out and engage in political advocacy. And secondly… Wait, wait, wait. A command what? That they go out and engage in political advocacy, Your Honor, on their personal time. A command… A command that you should do this. Well, Your Honor, the attempts to convince sometimes turn into attempts to coerce. Yes, but it isn't injury in fact unless there's in fact coercion. That's true. Except in your brief. Your Honor, no, it's true that there needs to be coercion, but coercion does not require punishment or even the threat of punishment. This Court said that in… Give me an injury in fact case you're relying on for that. 281 Care Commission says that the government… You rattle off these cases. I can't even hear you. What? 281 Care Commission. This Court said that neither punishment nor threat of punishment are required. This Court was relying on the decision of Bantam Books. And in Bantam Books, the commission there lacked the power to impose a formal punishment. Instead, the question is whether a person would have reasonably feared punishment. And the standard as related by this Court in 281 Care Commission is whether their fear of punishment was imaginary or wholly speculative. And so what is the fear of punishment here? Any time your employer gives you a demand that you engage in speech or advocacy… Okay, so you're assuming here for the purposes of the answer that it was a demand, which I think encouragement is different than a demand. That's true. But the SPS can cross the line into impermissible coercion through its words and actions. The sort of things that the… Okay, they can. What did they do? Yes, so it made commands that are non-mandatory, that they both engage in political advocacy in a form and express support to it, and it gave them unambiguous commands that they must share their personal views on matters of public concern to the training itself. I'll try to address those two things separately. I didn't hear what the fear was. Well, the fear would be a fear of punishment from your employer if you disobey the commands from the government employer. A person naturally… What's your best case for just I say I'm afraid, therefore I'm injured in fact? Well, again, in 281 Care Commission, the standard is actually whether or not the plaintiff… I don't care about dicta. I care about factual holdings. Well, let me give one recent 11th Circuit opinion. It's Speech Adversity Cartwright. That case concerned biased response teams that had no power to impose a punishment. And in the Cartwright case, the 11th Circuit said that having your speech labeled as offensive, negative, harmful, let alone hateful or biased, are all forms of intimidation that could cause a reasonable person to opt for self-censorship. And that actually very much fits what happened here. Of course, Ms. Henderson and Mrs. Longley succumbed to the district pressures that they engage in speech. They were told, speaker, you will be called upon. And they were told that… They weren't called upon, were they? Well, they weren't because they were told, speaker, you will be called upon. And then they didn't speak and they wouldn't. I just think that's kind of a mixed bag there. Well, it's certainly an unambiguous command that they speak. And it was accompanied by further pressure in the form that they were told that silence, at least on the part of white people, would be construed as an endorsement of white supremacy. Well, is that exactly right? I mean, I think that the slides you're talking about are sort of the idea of white supremacy in our culture and silence when you see things happening, how you respond or don't respond. But I understood at the training they weren't saying that if you don't talk, you're a white supremacist. I think they were sometimes saying, well, why don't you sit and reflect on this? Nobody speak. Or let's share our views. But those two things seem to be different. Silence in a training and silence as it was explained is relevant to the trainer's view to white supremacy in the society. It certainly doesn't amount to an imaginary fear when people see a slide put up by their employer that says white silence is a form of white supremacy. And this was accompanied by oral speech. For instance, Ms. Henderson put in her declaration that she was told denying your privilege is a form of white supremacy. And the slide shows themselves defying anti-racism and say the opposition of this is individual racism. Well, I agree with you. It would instill a desire, I don't think I want to work here. I don't think it's injury in fact. Well, Your Honor, I respectfully disagree, at least based on the Cartwright decision, having your speech labeled in that way. That's not controlling, of course. Well, it's not controlling. But, Your Honor, what is controlling is this Court's opinion in 281 Care Commission, which again speaks about injury in fact occurring so long as the fear of punishment is not imaginary. In what context? The name rings a bell. I haven't read it for years. 281 Care Commission, I can't remember the specific facts, but it was a law in question that was involved there. But that standard hails from the Supreme Court's decision in both Babbitt and Bantam books. There is nothing easier in the First Amendment than to find friendly dickens. Well, nevertheless, Your Honor, I think at a minimum it shows that the claim here was not clearly and indisputably meritless, which is a standard the district court had to find before finding frivolity. The judge seemed to be concerned that if this claim proceeded, then many claims involving training could proceed. Is there a limiting principle on your argument that would respond to that? And in connection with that, assume the training were more in line with what your clients would view as proper anti-racism training, that all men and women are created equal and colorblindness is the sine qua non of anti-racism and so forth, that some employee bought into the oppression matrix and objected to the training that you would feel is more appropriate, would we have a claim then from the opposite side? If it involved a demand that they go out and engage in political advocacy or affirm an ideology, then yes, we would have a claim regardless of the content. That's outside of the school. But I thought you were also arguing just within the training session, people were injured because they wouldn't want to say they agree with colorblindness or they would be chastised if they said I think white people are, you know, in a certain place on the oppression matrix and so forth. Would that apply the other way around, too? I think that involves speech on a matter of public concern, and it would apply. I think the contours to, Judge Colleton, your larger question, are what are the parameters of this? And I think it's well laid out in the public employee free speech context. It has to be speech on a matter of public concern, and it has to lay outside the scope of their job duties before we even get to the final step of pickering. So a school district could set up, we expect our employees, if ever asked about the point, to say I believe in democracy, and one who believes in totalitarianism now has a claim. I think both of them potentially have a claim if they're asking them to advocate for a belief system. Well, what's advocacy? Well, I think if you're – If the subject comes up in public, I would expect you, since you're known to be an employee of our school district, to support democracy as opposed to totalitarianism. I think that runs afoul of West Virginia v. Barnett as well as the Keesian case. In the Keesian case, the Supreme Court said that you can't even ask an English teacher to sign a note that he's not a subversive. And here we're extending the scenario to their personal opinions outside of the workplace when they're not speaking as a district employee. I think that that's – If I put it in terms, we expect you. I intentionally phrased it as not at demand. If it's accompanied by what we have here in the record of a showing that the district's expectations will be accompanied by all sorts of actionable metrics that rate their job performance, then yes. Yeah, but – okay. I know the arguments, and frankly, I'm not persuaded by it, that there was coercion of the kind that is required because we've got modules and all this stuff. You have to check a box. You have to do something affirmative in private. Most workplace training for government employees, Your Honor, does not require them to offer their personal opinions on matters of public concern. You can say that. Are they offering their personal opinions, or are they repeating back to the trainer what they understand the trainer wants them to understand? Well, of course, if that was true, that would be a textbook instance of having their speech compelled. Even within a training program, if you say to an employee, you know, I want you to draft an opinion on this case that's affirming or reversing, even though you disagree with it, I want you to write it up on this matter of public concern. I think telling them that they need to share their personal views on a matter of public concern crosses a clear First Amendment line, as well as telling them that they're expected to affirm support for an ideology and advocate for it in their personal time. So the military routinely violates the First Amendment. No, I disagree with that, Your Honor. The job duties inquiry for the military is very different than the job duties inquiry for an educator. In the Kennedy decision, the court said that the test for public employees is whether or not their job duties are ordinarily within the scope of that employee, and what's ordinarily within the scope of a soldier is very different from what's ordinarily within the scope of employment for a 504 process coordinator and a record secretary. My time is up. If there are no further questions, thank you. Ms. Fowler? May it please the Court, good morning. I am Tina Fowler. I, along with Mr. Ransom Ellis, am counsel for the defendants. You're going to have to speak up for me. I apologize. Oh, there is a microphone. And there is a lectern. The lectern moves. Okay. I represent the defendants, the appellees, the school district, Sprinkle School District R-12, along with its Board of Education, Dr. Garcia Pusateri, Dr. Latham, and Mr. Anderson. I would like to address some points that were just made with reference to the arguments made by the plaintiff's appellants. We have submitted that this case is in the context of a public school setting and the context is training. This is training. And the Court has asked about a case that, you know, factually, is there a case on point here? I think the reason that there is not a case that is directly factually on point here is because there was no punishment here. So the case that's probably most akin factually to this case, which is a case that did involve punishment, is the Altman case with reference to which Judge Loken wrote the opinion because in that case there was punishment. So the Court did have to undergo the Pickering analysis and look if there was a free speech violation in that case. So you look at this case. The primary issue here is not that they had to attend. The primary issue is that they didn't like the view. They made no bones about the fact that they do not agree with anti-racism. So this case is not about the school district telling them what they have to do in their private lives with reference to that principle. Wasn't there some discussion in the training about communicating these things in their private lives? It was with reference. I don't recall it being exactly something that had to say they had to say it in their private lives. It's more along the lines of just general acceptance of all peoples, all persons, sensitivity issues, those types of things. And there was never any type of punishment associated with any type of expression. What about the concern about, it was throughout the briefs, about loss of professional credit, loss of pay, and it was unclear. Some called it a docking of pay. Sometimes it just, you weren't going to be paid. What about that threat? With reference to that, it's just attendance. You only had to attend. If you attended, you were paid. And the record clearly reflects that certain employees did not attend and they were not paid. The pay was not conditioned on the message. It never was conditioned on the message. It was conditioned on being engaged or remaining professional. Is that fair? Wasn't there something that you could be asked to leave, lose the credit if you were not professional? Right, professional. We want you to come and be professional. It was never tagged to, you have to believe this. You have to have a belief in this to receive the pay. That's exactly right. I think what he's referring to is the definition that these trainers gave of anti-racism, which was to actively oppose racism by advocating for changes in political, economic, and social life. So I think the argument is that people were told that the district was training them to engage in anti-racism, which involved advocating for change in political, economic, and social life. Wouldn't that be outside of the workplace? I guess if you took it to that extreme. But there was never any type of detriment or we have to check a box to agree with this or we have to affirm this. And if you look at the facts in the case, they were never called upon. They were never asked to actually check a box that they agreed with any of that. They freely expressed their opinions. And, in fact, they rejected the opinions that were put forth during the training. And they weren't asked to leave. And part of this case is they've suggested that there was some type of subjective chill associated with that, oh, we did speak up. And then we were hushed and we were told we can't speak any longer. So then our speech was chilled because we thought the threat was there. And going back to the 281 case, which was before Judge Colleton, there actually was a threat there because they said, hey, we are going to violate the statute. We are going to exaggerate about this ballot initiative. There was not a similar threat here. And going back to the subjective chill piece, they claimed that they had to hush up. But if you look at their actions, they're directly contrary. In fact, Ms. Henderson, one of the plaintiffs in this case, after this training, she spoke with a board candidate objecting to the training. She said, I don't agree with the principles. I do not agree with anti-racism. Does the school board, by the way, endorse this? Yes, it was a program that was implemented as part of one of the strategies, the Focus Five strategies to enhance awareness. But, I mean, does the school board endorse this particular training involving oppression matrices and the definition of white supremacy that's used here and so forth? I mean, I don't know that if it actually went before the board. What I do know is that the board said we need to enhance training with reference to these sensitive issues. Well, I heard you say that. That's at a more general level. Right, right. But I thought maybe this had come before the board. This is what your administrators are doing. Well, I believe it. Ultimately, whether it came before Ms. Henderson spoke to the board or not, it did come before the board that there was a concern about this particular training. And she expressed those concerns. The interim superintendent was there, not the regular superintendent. So she sent an email after the fact, complaining even further. And the point to all of that is there is no subjective chill here. They clearly spoke their views. They weren't afraid to speak their views. And nothing happened to them. They never lost any type of pay. They were never reprimanded. They were never counseled. They were never spoken to. They were never hushed. Nor was any other employee, for that matter. And if you look at the context of this in the scope of what they're basically asking you to do, no court, to my knowledge, has ever struck down requiring employees to comply with lawful policies and trainings that are designed to educate the employees with reference to discrimination in the workplace. The exception is if there's some type of adverse action taken against the employee, such as in the Altman case. In that case, there can be a First Amendment violation because an adverse action is taken against the employee. But in this case, if you accept what they're asking this court to do, they're basically asking you to strike down the district's lawful policies. That's what they're asking you to do. And that's Pandora's box. As the district court said, that's untenable. That means any employee that has any disagreement with anything that's presented to them in a lawful training could result in litigation and a lawsuit. It basically means that a public employer couldn't put forth lawful policies. It couldn't instruct its employees how to appropriately handle themselves in the workplace. And this particular case is one of the things that you have to step back and look at it, too. What was the purpose? The purpose was the students. It's a perception case. It's not any different than my boss coming to me and saying, we believe that you sexually harassed this person or you discriminated against this person. And I say, no, I didn't. I don't think I did that. And the response is, well, but they believe you did. So that's what we're talking about here. We're talking about when you look at white supremacy. What if this was a hiring policy? Pardon me? What if this was a hiring policy? In the sense of? I'm not going to hire you if you don't believe in this definition of anti-racism. Well, I guess the answer would be to that would be, then you would definitely be tacking on adverse action. You're not punishing. Well, yes. Yeah, I mean, that would be the difference there. You would be actually tacking on adverse action, which did not occur in this case. And so if you look at, again, back at the perception, that's the point of this training. You may not mean it that way, but someone could perceive it that way. And if you look at the covert over white supremacy slide here, which is one that they make a big. But the claim would be different, wouldn't it? In hiring, there wouldn't be compelled speech. And there wouldn't be the other basis for their claim. True. Chill. Right. There wouldn't be chilling and there wouldn't be compelled speech. Right, right. But you're acknowledging it would know quite well. And if done by a state actor under color of state law, it would be actionable. Yes, I would agree with that, yes. Much better analysis than I gave. What did it mean when it said in the materials that if people didn't act professionally, then they'd be asked to leave and denied credit for the training? What does it mean to act professionally? Can you refuse to accept the training and act professionally? Or would that be unprofessional? I believe absolutely you could refuse to accept the training. You know, you could have left. They could have left the training. To my knowledge, no one. I thought they were required to attend. Well, they just wouldn't have been paid if they left. Well, that would be an adverse action then if they weren't paid. Well, it was additional pay. It was supplemental pay. It was an addition. It was an addition to their regular hours. It was additional pay. It was like overtime pay? No, it was pay that was negotiated through a collective bargaining agreement. It was supplemental pay. Supplemental pay for training? For training, yes. It was specifically additional to specific hours, yes. So you're saying it was optional for the employees? It was optional. Or did they need to get the credit to keep their jobs? Well, no. It wasn't about keeping their jobs. It was just about being paid for training. There was never any threat that you're going to lose your job if you don't attend this training. And, in fact, the record shows that there were certain employees that didn't attend the training. But they had a right to do it and to get paid for it. Right, that's right. Yeah, that's exactly right. They had a right to attend it to basically get paid for it. But they would be excluded and docked the pay if they were not professional. According to the guidance, as I understood it, they would be asked to leave. I don't look at it as a docking. I think that if they were unprofessional, not based on their view, again, this is not based on your view, if you're unprofessional and, for some reason, someone asks you to leave, you're just not in attendance. It's not a docking of pay. I was just trying to understand what professionalism means in this context. I'd say it's amateurish. I mean, it either means something bad or it has no practical meaning at all. Right, right. And, to my knowledge, everyone was professional. And probably the person that authored it hoped it would be taken as something bad. I can't speak to that. But I want to make a point on the white supremacy chart with reference to that. The trainer specifically, and it's in the record, the trainer specifically told the individuals that we are not calling you white supremacists. I mean, that is specifically in the record. There wasn't any indication that that was going on. Refer to court to 1970 with reference to that. Well, how could they say that if they said they defined colorblindness as white supremacy and one of the employees was saying, that's my view? They can say that. They can say that's their view, but they can also say that if you say that's your view, that could be perceived by somebody as white supremacy. That's all that is, is to say this is a perception. It's just like the example I gave earlier. I didn't know that you perceived my comment as derogatory, but you did. It's the same thing. And so I could be accused of discriminating. I could be accused of being a white supremacist when I didn't mean that at all. That's not the way that I meant it. It's an attempt to intimidate. And it may well not cause actual injury, but it's, to me, highly offensive. Well, with reference to whether it was offensive and the employees may have disagreed with it, there wasn't any requirement that they adopt the view. And the record is very clear on that. Didn't they have to answer questions that would be deemed correct or incorrect? And only the correct answers would be the ones adopting the view of this training? That was only with reference to online modules, which were separate from this training. And those questions were benign questions. They were questions about what do you do when you see xenophobia in the classroom, those types of things. They were entirely separate? The online questions that Ms. Henderson took were separate from the two hours of training. Why was she doing them if they were not part of the training? It was a separate, with reference to her job classification, it was a separate program for certain job classifications to do as part of, that they would do outside of the two hours, and she was paid for those. And it wasn't the same training. It was different from the slides and the training that we're talking about here within the two hours. I'm out of time, but I would ask that the court please uphold the district's courts. I have one question that I want to, because it's an important but different question. Would you agree that it took the discovery in this case to establish there was no injury in fact, if indeed that is affirmed? I would agree with that, yes. That strikes me as highly relevant, attorney's fees. That means as pleaded, it was not frivolous. At the end of the pipeline, it looked to the district court like it was frivolous. Do you disagree with that? Under this court's precedent and interpretations, yes I do. Because there have been courts, including this court, that has said you have to, like the Flowers case, you have to push aside the smoke screen before you can really see what's there. And then the case has been found as frivolous, and attorney's fees have been awarded in that case, yes. What case is on point here that would show that this sort of claim is frivolous? I mean, this training seems to be unprecedented as far as I can tell in any reported decision. Is there anything comparable that would have alerted the plaintiffs that this is clearly outside the realm of even if you're ultimately right on the merits? Or on standing? I'm sorry, go ahead. Or on standing, even if you're ultimately right on one of those two points? I believe that this court's decision in Bond v. Keck is on point, factually. In that case, the judge in that particular case, as did the judge in this case, basically questioned early on whether the case had factual standing. And they continued to push forward with the litigation. Did you say Bond v. Keck? Yes, sir. You're just saying that's a case where the judge raised the question early, but that's not a case that would show this claim itself is frivolous. Well, but in this particular case, the judge raised this very question early, within a couple of months of this case being filed, for those exact reasons. And asked those very poignant questions with reference to, was there any case out there that showed this training was unlawful? Or did the people involved still work for the school district, et cetera? Was the concern on the standing, the injury in fact, is that the frivolousness of the case? Just whether or not there was any recognizable harm? Right. Yes, I believe that's true. Yes. Any further questions? I would ask that the court please uphold the district court in all respect, with reference to its shunning judgment order and its order awarding the district its reasonable attorneys fees. Thank you. Thank you. Mr. Busick, any time? His time had expired. I'll give you a couple minutes. Thank you, Your Honor. I appreciate the extra time, Your Honor. Just to make a couple of points. First, it seems to be undisputed that the position that SPS has staked out is that the absence of punishment here is dispositive. And yet it is black letter law from the Supreme Court in Bantam Books that informal sanctions are sufficient to chill speech. And the Supreme Court in Bantam Books goes on to say that that might be coercion, that might be intimidation, and that might also just be persuasion that crosses the line. And to Judge Loken's point to opposing counsel, he raised the fact that this looked like an attempt to intimidate. And an attempt to intimidate is more than adequate to cause a reasonable person to self-censor. This was highly charged training, and that fact alone shows that Ms. Henderson and Mrs. Lonely have stated a viable theory of injury. I'll quickly address a couple of factual things just to clean up. On the supplemental pay issue, this whole thing is an attempt to backfill what they actually said to these plaintiffs. There's a record entry at Record Entry 776, which is an email that went out that says the training is mandatory, and if you are not there, then your pay will be docked. That's what they were telling employees, and that's what employees thought. Nobody had any realistic sense that they just couldn't come to this training and they wouldn't get paid as much. They were also told there were several questions asked about the command to act professionally or leave and what that meant. Courts note that imprecision in a speech policy is something that only serves to heighten and exacerbate the chilling effect, and that's present here because of that threat that you must stay professional, and nobody knows what that means. The final points I'll touch on is, my opposing counsel said no other employee felt this way. This is a very revealing email exchange found at Record Entry 77-17 that relates how other employees are fearing to talk because of how they'll be treated, and it even resulted in an additional trainee crying in response to the training and the trainee's dismissive views of her sincerely held convictions. My time is up. If there are no further questions. One factual question. Is it accurate that these modules that are talked about in the briefs that had the correct and incorrect answers are different from the two-hour training session? That's correct. That was correct. Ms. Henderson had to undergo additional training owing to her duties as a 504 process coordinator. However, these were not limited to modules where you're supposed to just demonstrate your knowledge of a specific policy, even though those modules themselves embedded anti-racism in the answers. For instance, Ms. Henderson was assigned a cultural competency self-assessment where she had to rate her own cultural competency. And in it, she said that as a white person, she could not be perceived as an unbiased ally by a person of color just owing to her race. She didn't believe that, but she answered it anyway to satisfy the district. And this means that even if it was necessary to show that the district's pressure succeeded in altering speech or belief as the district court seemed to believe, even that showing was met here. And of course, a finding that there's any dispute in fact here should revolt in reversal of the award of summary judgment. Did she have to answer that way to get through the module? That particular module, there's no indication that she had to answer it any particular way. And would anybody have known how she, did they score it? Yes, now there's some dispute about that in the record, but I believe there's proof from Ms. Henderson that shows that they knew when she completed or failed to complete the training module. Well, completing, but the actual answers. I don't know that that was ever told to them one way or the other. I think the district's taken the position that they were anonymous and they didn't know. But I think that's irrelevant for purposes of whether or not a person was intimidated into giving the views that it thought the government wanted to hear. Why wouldn't any training require the person to give the views the employer wants to hear? The employer wants the employee to understand this is our policy. I mean, if you take it out of this thing and you put it in just, you know, here's how we want you to do your job, maybe the employee doesn't agree with that, but that's how the boss wants them to do it, so they've got to show they understand it. Isn't that, that's not compelled speech, is it? No, and I think the reason why is because that's speech ordinarily within the job duties of a particular employee, but at a minimum that workplace training has to be about their obligations in the workplace, and even a cursory view of this training shows it was far, far more than that, such as having her rate her own cultural competency. Remember in the Kennedy case of just last summer, that case concerned a football coach whose speech was in the workplace, and the Supreme Court rejected the argument that just because he's a role model, it meant that the government could control his speech. Going all the way back to Garcetti, the Supreme Court has cautioned that public employers cannot sidestep the important protections of the First Amendment just by crafting unnecessarily broad job descriptions, and the same would be true of training. Thank you, Your Honor. Appreciate the court's time. Interesting case, and somewhat novel issue, if there is such a thing in the First Amendment. I would certainly agree, Your Honor, and I appreciate the court's time. Well briefed and argued, we'll take it under advisement. Thank you, Your Honor.